ALTO LITIGATION, PC
Bahram Seyedin-Noor (Bar No. 203244)
bahram@altolit.com
Joshua Korr (Bar No. 304577)
josh@altolit.com
Anthony Basile (Bar No. 247409)
anthony@altolit.com
1 Embarcadero Center, Suite 1200
San Francisco, CA 94111
Telephone: (415) 779-2586
Facsimile: (415) 306-8744

Attorneys for Plaintiffs
MAGS GLOBAL CAPITAL LLC and
MOZAFAR MAGHSOUDNIA

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| MAGS GLOBAL CAPITAL LLC, a California limited liability company, and MOZAFAR MAGHSOUDNIA,<br><br>Plaintiffs,<br><br>v.<br><br>CITIBANK, N.A., a national association, and DOES 1-20, inclusive,<br><br>Defendants. | Case No. ________________<br><br>**COMPLAINT FOR:**<br><br>**(1) VIOLATION OF CALIFORNIA COMMERCIAL CODE § 11207**<br>**(2) DECLARATORY JUDGMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs MAGS GLOBAL CAPITAL LLC ("Mags Global") and MOZAFAR MAGHSOUDNIA ("Mr. Maghsoudnia") sue Defendants CITIBANK, N.A. ("Citibank") and Does 1–20 (collectively, "Defendants") for the causes of action alleged below:

## INTRODUCTION

1. Plaintiffs bring this Action to recover $45,144,330.67 from Citibank due to its failure to properly handle multiple wire transfers that Plaintiffs instructed it to deposit with Granite Escrow & Settlement Services ("Granite Escrow") to complete a real estate transaction.

2. Rather than ensuring that the payments were deposited into Granite Escrow's account, as Plaintiffs had instructed, Citibank deposited the payments into an account held in the name of an unrelated entity called Transpo Express LLC ("Transpo Express") that was controlled by fraudsters. As a result, Granite Escrow never received the funds, Plaintiffs did not receive the real estate they instructed Citibank to pay for, and the fraudsters made off with tens of millions of Plaintiffs' dollars.

3. Citibank is liable for this loss under California Commercial Code section 11207 ("Section 207") because it processed these payment orders despite having knowledge of the mismatch between the name of the identified transaction beneficiary (Granite Escrow) and the name of Citibank's accountholder (Transpo Express). Section 207(b)(2) states that a bank cannot accept a payment order when it "knows that the name and [account] number identify different persons." If it improperly does so, the comments to Section 207 make plain that the "Beneficiary's Bank takes the loss."

4. Accordingly, Plaintiffs bring this Action for violation of Section 207, declaratory judgment, and such other relief as the Court may deem proper.

## THE PARTIES

5. Plaintiff MAGS GLOBAL CAPITAL LLC is a California limited liability company with its principal place of business in Santa Clara County, California.

6. Plaintiff MOZAFAR MAGHSOUDNIA is an individual residing in Santa Clara County, California. Mr. Maghsoudnia is a manager and member of co-plaintiff Mags Capital.

7. Plaintiffs are informed and believe, and on that basis allege, that defendant

CITIBANK, N.A. is a national banking association doing business in Santa Clara County, California, with its main office as specified in its Articles of Association in Sioux Falls, South Dakota. Plaintiffs are informed and believe, and on that basis allege, that CITIBANK, N.A. is a subsidiary of Citigroup, Inc.

8. The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants sued herein as DOES 1 through 20, inclusive, are currently unknown to Plaintiffs. Plaintiffs therefore sue Defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each of the Defendants designated herein as DOE is legally responsible in some manner for the unlawful acts referred to herein. Plaintiffs will seek leave of court to amend this Complaint to reflect the true names and capacities of the Defendants designated as DOES when such identities become known.

9. Plaintiffs are informed and believe, and thereon allege, that each Defendant in this action, including those fictitiously named, was at all times relevant to the allegations herein jointly, severally and/or vicariously liable for the acts of all other Defendants, and is and was at all times relevant hereto (a) the agent, servant, employee, officer, supervisor, alter-ego, co-conspirator, representative, partner, joint venturer, or surety of each and all of the other Defendants unless otherwise specified, and/or (b) acting with the consent and at the direction of each of the other Defendants and within the course and scope of this agency, employment, supervision, alter-ego, conspiracy, representation, partnership, joint venture, or suretyship, and with the knowledge, consent, approval or ratification of, and at the direction of, each of the other Defendants in taking the act or omissions alleged herein.

## JURISDICTION

10. This Court has jurisdiction over the subject matter of this Action under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 exclusive of interest and costs and there is a diversity of citizenship between Plaintiffs and the Defendant.

11. This Court has personal jurisdiction over Citibank because Citibank regularly conducts business within this judicial district, including through numerous branches and its offices in San Jose, California.

12. Venue is proper within the Northern District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this Action occurred in this district.

## DIVISIONAL ASSIGNMENT

13. Assignment to the San Jose Division of this Court is proper because a substantial part of the events or omissions giving rise to the claims herein occurred in Santa Clara County, California.

## FACTUAL ALLEGATIONS

### I. An Overview of Business Email Compromise Scams and Citibank's Response to Them

14. In a standard business email compromise ("BEC") scam, a fraudster "create[s] a fake email account or website (or both), and then send[s the target] a message that appears to be from a trusted source, demanding payment or requesting confidential information."[1]

15. Citibank pays particular attention to BEC scams because they cause billions of dollars in losses each year and "are the root cause of payment fraud for most organizations."[2] According to Kenneth Conner, Citibank's Senior Vice President of Scam Policy and Communications, fraudsters "look for opportunities to insert themselves into your normal transactions to change the destination of the funds."[3]

16. Citibank has identified "[r]eal estate closings" as one of the most "commonly targeted scenarios" for BEC scammers.[4] In such situations, the "[s]cammers claim to be the title or real estate agent … and send different payment details."[5]

17. According to Citibank, "[o]nce a wire transfer or ACH payment is executed, there

---

[1] *Scammers are Targeting Email Inboxes. Here's What to Watch For.*, CITI (Jul. 4, 2024, at 10:13 AM), https://lifeandmoney.citi.com/lam/articles/money/finance-101/business-email-scams.
[2] *Beware payments fraud*, CITIBANK (Feb. 5, 2024), https://www.privatebank.citibank.com/insights/beware-rising-payments-fraud; *see also* CITIGROUP, BUSINESS EMAIL COMPROMISE (2021), https://www.citigroup.com/rcs/citigpa/storage/public/icpublic/2021-BEC-Infographic.pdf (noting $1.9 billion in BEC losses in 2020); *How Vulnerable Are You to Scams?*, CITI (Nov. 29, 2023), https://www.lifeandmoney.citi.com/lam/articles/money/finance-101/how-vulnerable-are-you-to-scams (noting $8.8 billion in reported fraud losses in 2022 due in part to BEC scams).
[3] *See supra*, note 1.
[4] *Id.*
[5] *Id.*

often is little or nothing the payee can do to recoup their money."[6] That is why Citibank employs advanced technology to scrutinize wire transactions in real time.

18. In May 2024, Citibank's Head of Global Financial Crime and Fraud Prevention, Michael Steinbach, announced that Citibank had created a partnership with Nasdaq's Verafin platform to leverage artificial intelligence and machine learning to detect BEC scams.[7] Verafin is marketed as an advanced transaction monitoring tool that was designed to "[p]revent loss" from "criminal schemes such as Business Email Compromise."[8] Steinbach explained that the partnership began because his "managers identified a significant growing threat—scams, business email compromise—and went to Verafin and said 'hey, can you help us.'"[9]

19. One of the core features Verafin advertises for detecting BEC scams is its ability to "rapidly detect name mismatches."[10] It touts that its "analytics leverage insights from 725 million counterparties to identify payor-payee name mismatches in real time to improve fraud detection."[11] Verafin also highlights its ability to detect "money mules,"[12] *i.e.*, individuals who move money at the direction of a criminal in exchange for a commission while remaining willfully blind to obvious red flags.[13] Money mule accounts are often used in BEC scams and present additional indicia of fraud.

20. Beyond Verafin, reports indicate that Citibank has "integrated advanced machine learning models and real-time analytics into its transaction monitoring infrastructure," including by "partnering with … Feedzai, a company specializing in real-time risk management solutions for financial institutions."[14] With respect to the Feedzai integration: "While AI does the heavy

---

[6] *Id.*
[7] NASDAQ, *Fighting Fraud in an Evolving Landscape | Citi's Partnership with Nasdaq Verafin* (YouTube, May 14, 2024), https://www.youtube.com/watch?v=7wYqzIsEPpE (announcing Citi's partnership with Nasdaq Verafin).
[8] *Wire Fraud*, NASDAQ VERAFIN, https://www.verafin.com/solution/wire-fraud (last visited July 30, 2025).
[9] *Id.*
[10] *Id.* (capitalization omitted).
[11] *Id.*
[12] *Id.*
[13] *Money Mules*, FED. BUREAU OF INVESTIGATION, https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/money-mules (last visited July 30, 2025)
[14] *5 ways Citigroup is using AI [Case Study][2025]*, DIGITALDEFYND, https://www.digitaldefynd.com/IQ/citigroup-using-ai-case-study (last visited July 30, 2025).

lifting in terms of detection, flagged transactions are routed to compliance officers for review, ensuring human oversight and accountability."[15]

21. Citibank's January 2025 report on Agentic AI further notes that machine learning tools help "identify true positives" when detecting "scams and frauds," which allows banks to triage which fraud alerts will be "made available to a bank's fraud team."[16]

22. It has been widely reported that Citibank has implemented Verafin and Feedzai to detect name mismatches and other indicia of fraud in connection with wire transactions. Plaintiffs are informed and believe, and thereon allege, that when Verafin or Feedzai flag a suspicious transaction, it is reviewed by a Citibank employee, including for name mismatches, before the transaction is processed.

23. Plaintiffs are informed and believe, and thereon allege, that Citibank also uses other security tools to monitor wire transactions, including security tools and processes that are not shared with the public because doing so would reveal sensitive security information to cybercriminals. Citibank employs these tools both to detect BEC scams and other kinds of fraud, and because the Bank Secrecy Act requires financial institutions to take steps to detect and prevent money laundering. This includes reporting suspicious activity that might suggest money laundering, tax evasion, or other criminal activities. In other words, Citibank is required by law to monitor all transactions in an effort to detect suspicious and fraudulent transactions.

24. Plaintiffs are informed and believe, and thereon allege, that the transaction monitoring tools Citibank employs, including Verafin, Feedzai, and others, are designed to detect account name mismatches; flag suspected money mule accounts (including by reference to accounts that are opened with the minimum deposit and thereafter only used to accept large payments); identify when address information for a beneficiary does not match the address associated with an account holder; identify when the word "escrow" is missing from the account name of a beneficiary in a real estate escrow transaction; scrutinize large transactions more

---

[15] *Id.*
[16] RONIT GHOSE, ET AL., CITI INSTITUTE, AGENTIC AI: FINANCE & THE 'DO IT FOR ME' ECONOMY 41 (2025), https://www.citigroup.com/rcs/citigpa/storage/public/GPS%20Report_Agentic%20AI.pdf.

closely; and detect other indicia of fraud. On information and belief, these tools prompt a Citibank employee to review flagged transactions before those transactions can be accepted.

## II. The Transactions at Issue in This Case

### A. The Fraudsters Form Transpo Express and Open a Citibank Account in its Name

25. In November 2024, an unidentified individual registered Transpo Express as a New Jersey limited liability company with the New Jersey Department of State.

26. Shortly thereafter, an individual who identified herself as Kiara Coleman ("Ms. Coleman") opened a Citibank account in Transpo Express's name in Hoboken, New Jersey. On information and belief, Ms. Coleman is a "money mule."

27. Plaintiffs are informed and believe, and thereon allege, that Ms. Coleman went in person to Citibank's Hoboken branch and presented identification and documents to Citibank employees to clear Citibank's security procedures. On information and belief, those documents included copies of formation documents for Transpo Express, evidence of ownership of that entity, and evidence that she was an authorized representative of it.[17]

28. On information and belief, Ms. Coleman deposited $100 into the Transpo Express account in December 2024 to meet the minimum account threshold.

29. Based on information gleaned from other active litigations, Plaintiffs are informed and believe, and thereon allege, that Transpo Express's Citibank account had little account activity prior to the transactions at issue in this case.

### B. The Fraudsters Infiltrate the Underlying Real Estate Transaction

30. In December 2024, Mr. Maghsoudnia's family trust entered into an agreement to purchase real property in Newport Coast, California for $46,345,284.50.

31. The seller selected Granite Escrow of Newport Beach, California as the escrow company for the transaction.

32. Mr. Maghsoudnia was introduced to seller's escrow officer, Jenna Dannelly, via

---

[17] Citibank acknowledges that it must comply with legal and regulatory requirements for customer due diligence under applicable anti-money laundering statutes and "Know Your Customer" laws. *See Anti-Money Laundering (AML)*, CITIBANK (2018), citibank.com/tts/sa/digital-account-guide/key-documentation/aml-documentation.html.

email shortly thereafter.

33. On December 10, 2024, a fraudster began impersonating Dannelly in communications with Mr. Maghsoudnia by using an email address that was identical to Dannelly's except that instead of using the domain @graniteescrow.com, it used the domain @granitesescrows.com.

34. Thereafter, the fraudster instructed Mr. Maghsoudnia to pay the purchase price for the property using a set of wire instructions that included the account number for Transpo Express's Citibank account.

35. Based on those instructions, Mr. Maghsoudnia made three substantial wire transfers to Citibank: one from Mags Capital's account at a regional bank called Technology Credit Union, and two from his personal account at Morgan Stanley.[18] Transpo Express was not entitled to receive these funds, which it procured through fraud.

### C. The $26 Million Technology Credit Union Payment Order

36. On January 13, 2025, Mags Global initiated a wire transfer payment order for $26,137,740.50 to Granite Escrow from its account at Technology Credit Union (the "Tech CU Payment Order").

37. The Tech CU Payment Order that Mr. Maghsoudnia filled out named "Granite Escrow Settlement Services" as the intended beneficiary and provided the street address for Granite Escrow in Newport Beach, California. But in an obvious mismatch, it directed payment to the account number corresponding to Transpo Express's Citibank Account. Plaintiffs, of course, had no way of knowing that the account number actually corresponded to Transpo Express.

38. The outgoing wire detail reveals that because the amount of the Tech CU Payment Order "[E]xceeds $8,000,000.01" it was immediately flagged as suspected fraud and subjected to internal review prior to transmission. Almost three hours later it was "verified" internally by Joe Anzalone, which triggered a fraud update in the system. The payment order was reviewed for a second time twenty minutes later by Alma Zamora. It was then cleared for transmission to

[18] He also made two $1,000 test wires.

Citibank.

39. Citibank accepted the Tech CU Payment Order and credited $26,137,740.50 to the Transpo Express Citibank account. As alleged more fully *infra*, at paragraphs 46–49, Plaintiffs are informed and believe that Citibank did so despite having knowledge of the mismatch between the name on the payment order (Granite Escrow) and the name of its account holder (Transpo Express).

40. As a result, Technology Credit Union debited Mags Global's account $26,137,760.50, which included the full wire payment plus a $20 bank fee.

D. The $19 Million Morgan Stanley Payment Orders

41. On January 13, 2025, Mr. Maghsoudnia submitted an $18,885,220.50 payment order to Granite Escrow from his personal Morgan Stanley account. On January 15, 2025, he submitted an additional $119,369.67 payment order to Granite Escrow from this account (collectively the "Morgan Stanley Payment Orders").

42. The Morgan Stanley Payment Orders named "Granite Escrow and Settlement" as the intended beneficiary and provided the street address for Granite Escrow in Newport Beach, California. As with the Tech CU Payment Order, both identified the account number corresponding to Transpo Express's Citibank account.

43. Thereafter, Morgan Stanley posted the Morgan Stanley Payment Orders for transmission, and both were transmitted to Citibank.

44. Citibank subsequently accepted the Morgan Stanley Payment Orders and credited them to Transpo Express's Citibank account. As alleged more fully *infra*, at paragraphs 46–49, Plaintiffs are informed and believe that Citibank did so despite having knowledge of the mismatch between the name on the payment order (Granite Escrow) and the name of its account holder (Transpo Express).

45. As a result, Morgan Stanley debited Mr. Maghsoudnia's account in the amount of $19,004,590.17.

III. Citibank Knew of the Mismatch

46. Citibank maintains a Global Financial Crime and Fraud department that has

actively focused on the problem of BEC scams. As alleged in paragraphs 18–24, *supra*, Citibank has adopted tools to monitor wire transfers for fraud, including BEC scams. As acknowledged in media statements and reports, those tools include Nasdaq Verafin, Feedzai, and other transaction monitoring technologies that flag indicia of fraud and trigger review by a Citibank employee before suspected transactions can be processed.

47. On information and belief, a warning at Citibank would be triggered when (1) deposits were made into accounts at Citibank which identified payees other than the Citibank account holder; (2) a payment order exceeds a specified financial threshold that was smaller than the transactions at issue in this case; (3) a payment order was directed to the account of a suspected money mule (including by reference to accounts that are opened with the minimum deposit and thereafter only used to accept large payments); (4) address information for a beneficiary does not match the address associated with an account holder; and/or (5) in other circumstances that the bank and/or its security vendors deem suspicious.

48. Here, the Tech CU Payment Order and the Morgan Stanley Payment Orders identified payees that did not match or even closely resemble the names of the Citibank account holder; were for tens of millions of dollars; were directed to an account of a suspected money mule; identified payment addresses that did not match the address of the payee; directed payment to an escrow company even though Citibank's accountholder did not have the word "escrow" in its business name; and contained other indicia of fraud. Furthermore, Transpo Express's Citibank account was effectively empty and dormant for months, before suddenly being the ostensible beneficiary of over $45 million in wire transfers.

49. Plaintiffs are informed and believe, and thereon allege, that Citibank's state of the art proprietary, patented and third-party fraud detection systems, which specifically monitor for these kinds of frauds, detected the mismatches between the intended beneficiary (Granite Escrow) and the name of the accountholder (Transpo Express) on the payment orders for the wires from Tech CU and Morgan Stanley as well as other indicia of fraud in connection with those transactions, and elevated these transactions for human review, including human review of the mismatch. Citibank nonetheless failed to halt these orders in a timely fashion, thereby

damaging Plaintiffs.

## CLAIMS FOR RELIEF

## COUNT I

## (VIOLATION OF CAL. COM. CODE § 11207(b) – UCC ARTICLE 4A-207(b))

50. The allegations of paragraphs 1–49 are realleged and incorporated herein by reference.

51. The Uniform Commercial Code ("UCC") has been adopted by all fifty states including, as relevant here, California. Section 207 states that if the beneficiary's bank receives a payment order and knows that the name and number provided in the payment order refer to two different persons, then it is not permitted to accept the payment order. Cal. Com. Code § 11207(b)(2). The comments to Section 207 make clear that if the Beneficiary's Bank accepts the payment in error, the "Beneficiary's Bank takes the loss."

52. On information and belief, and as further alleged *supra* at paragraphs 18–24 and 46–49, the Tech CU Payment Order and the Morgan Stanley Payment Orders triggered Citibank's fraud detection systems, which led to review by one or more Citibank employees such that Citibank had knowledge of the mismatch between the name of the identified beneficiary, "Granite Escrow Settlement Services," and the name of the Citibank accountholder, "Transpo Express LLC." Based on these facts, Citibank had knowledge of the mismatch within the meaning of Commercial Code §§ 1202(b) and 1202(f), which govern knowledge for purposes of Section 207. The comments to Section 207 state: "'Knowledge' and 'knows' are defined in Section 1-202(b) to mean actual knowledge, and Section 1-202(f) states rules for determining when an organization has knowledge of information received by the organization."

53. Despite having knowledge of this mismatch, Citibank accepted the Tech CU Payment Order and an earlier January 10, 2025 Technology Credit Union "test" payment order and credited the Transpo Express Citibank account in the amount of $26,138,740.50, in violation of Section 207(b)(2).

54. Despite having knowledge of this mismatch, Citibank accepted the Morgan Stanley Payment Orders and an earlier January 10, 2025 Morgan Stanley "test" payment order

and credited the Transpo Express Citibank account in the amount of $19,005,590.17, in violation of Section 207(b)(2).

55. As a direct and proximate result of Citibank's unlawful conduct, Plaintiffs have suffered damages in amounts to be determined at trial.

## COUNT II

## (DECLARATORY JUDGMENT)

56. The allegations of paragraphs 1–55 are realleged and incorporated herein by reference.

57. An actual controversy has arisen and now exists between Plaintiffs and Citibank concerning whether acceptance of the Tech CU Payment Order and the Morgan Stanley Payment Orders could occur in light of Citibank's knowledge that the name of the intended beneficiary in those payment orders (Granite Escrow) did not match the name of the Citibank accountholder corresponding to the identified account number (Transpo Express), and that Transpo Express was not entitled to receive payment of the funds transfers from Plaintiffs.

58. Plaintiffs seek a declaration stating that Citibank's acceptance of the Tech CU Payment Order and the Morgan Stanley Payment Orders could not occur under Section 207(b)(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for this Court to grant the following relief:

1. For judgment to be entered in favor of Plaintiffs and against Defendant;

2. For a declaration that no person has rights as a beneficiary of the Tech CU Payment Order and the Morgan Stanley Payment Orders, and that acceptance of the Tech CU Payment Order and the Morgan Stanley Payment Orders could not occur;

3. For damages in an amount subject to proof at trial;

4. For interest as allowed by law;

5. For costs of suit incurred herein;

6. For reasonable attorneys' fees as allowed by law; and

7. For such other and further relief as this Court deems just, equitable, or appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Civil Local Rule 3-6 and Federal Rules of Civil Procedure Rule 38, Plaintiffs request a trial by jury for all causes of action, claims or issues in this action that are so triable.

Dated: August 1, 2025

ALTO LITIGATION, PC

By: */s/ Bahram Seyedin-Noor*
Bahram Seyedin-Noor
*Attorneys for Plaintiffs*
*Mags Global Capital LLC and*
*Mozafar Maghsoudnia*